**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**INSURASOURCE, INC.**                                                                                                     **PLAINTIFF**

**v.**                                           **CIVIL ACTION NO. 2:11-CV-76-KS-MTP**

**COWLES & CONNELL OF NY, INC., et al.**                                         **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, the Court **grants** Defendants' Motion to Dismiss [9] for lack of personal jurisdiction.

**I. BACKGROUND**

Plaintiff is a Mississippi corporation which finances insurance premiums. Under the typical terms of Plaintiff's finance agreements, policyholders are required to make regular monthly payments to Plaintiff. Policyholders also grant Plaintiff a security interest in any unearned premiums that may be refunded upon cancellation of the policy and grant Plaintiff power of attorney with respect to cancellation of the policy. Therefore, if a policyholder defaults on its obligations to Plaintiff, Plaintiff can cancel the policy at issue and collect the unearned premiums. Plaintiff typically provides the insurance carrier on the policy with notice of the finance agreement, the power of attorney, and the purported security interest in any unearned premiums.

In late October and early November 2009, a New Jersey insurance agency titled John A Rocco Co., Inc. ("Rocco") contacted Plaintiff to solicit its insurance premium financing services. Plaintiff's principal contacts at Rocco were individuals named John A. Rocco and Kelly Roetto.[1]

---

[1] On March 28, 2011, New Jersey's Department of Banking and Insurance revoked the licenses of both Rocco and Roetto for multiple counts of obtaining premium financing that was not authorized by the applicant, obtaining duplicate premium financing on the same policy,

In December 2009, Rocco entered into a Broker's Agreement (the "Agreement") with Defendant, a corporation organized under the laws of New York and Connecticut.[2] Defendant is a general agent for a number of insurance companies, for which it is authorized to bind and issue insurance policies and collect premiums. According to the Agreement, Rocco was authorized to submit insurance applications to Defendant. Rocco apparently received a commission for the policies it placed with Defendant.

In late 2009 and early 2010, Rocco obtained premium financing from Plaintiff for multiple insurance policies placed with Defendant (the "Rocco accounts"). Plaintiff alleges that it provided Defendant with written notice of the financing agreements. In February and March 2010, a number of the Rocco accounts defaulted on their obligations to Plaintiff. Plaintiff contacted Defendant to inquire about the unearned premiums from some of the policies. Defendant responded that Rocco had never remitted premiums for some of the policies.[3] When Plaintiff contacted Rocco to investigate, Rocco assured Plaintiff that it had paid the premiums to Defendant. According to Defendant, it stopped writing policies for Rocco as early as March 30, 2010. However, Rocco continued to represent that Defendant was the general agent on the accounts it submitted to Plaintiff.

Plaintiff attempted to cancel policies and collect unearned premiums as early as February 2010, but Plaintiff alleges that Defendant never remitted any of the unearned premiums. After several months of communication, Defendant provided Plaintiff with an accounting of all accounts

---

obtaining premium financing in excess of the premium amount, and forgery.

[2]Plaintiff named two Defendants in this matter: Cowles & Connell of New York, Inc. and Cowles & Connell of Connecticut, Inc. The Court shall refer to them collectively as "Defendant."

[3]Plaintiff alleges that this representation was false.

2

with respect to which it had received notice of cancellation and a finance agreement from Plaintiff. Defendant represented to Plaintiff that it had never bound policies with respect to a number of the finance agreements it received from Plaintiff. According to Defendant, it owed Plaintiff $50,563.51 in unearned premiums. Plaintiff disputes several aspects of the accounting. First, Plaintiff alleges that Defendant owes it more than $50,563.51. Second, Plaintiff alleges that Defendant's accounting did not include all of the accounts for which Plaintiff had sent Defendant a finance agreement. Third, Plaintiff alleges that Defendant did, in fact, write policies for all the insureds on the list, despite its claims to the contrary.

Plaintiff alleges that Defendant took the funds it received from Rocco – who had obtained them from Plaintiff – and applied them to other policies Defendant had written with various insurance carriers. Plaintiff further alleges that Defendant then cancelled some of the Rocco policies due to purported nonpayment and spread the funds from those policies over all the accounts in an attempt to lower its exposure. More pertinent to the present motion, Plaintiff alleges that Rocco was at all relevant times Defendant's authorized agent, that payments made to Rocco constituted payments to Defendant, and that Defendant is liable for any fraud perpetrated by Rocco.

In its Complaint, Plaintiff specified thirty-two different policies for which Defendant allegedly refused to remit payment of approximately $500,000.00 in unearned premiums. Plaintiff asserted the following causes of action: conversion and unjust enrichment. Plaintiff demands an accounting of all the accounts at issue; the return of all unearned premiums, totaling approximately $500,000.00; interest at the rate of five percent per month as provided by New Jersey law; punitive damages; attorney's fees; and costs. Defendant filed a Motion to Dismiss [9] for lack of personal jurisdiction, which the Court now addresses.

## II. DISCUSSION

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997). However, where the Court "rules on a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff need only make a prima facie case that jurisdiction is proper." *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006). While the Court is not limited to consideration of only the allegations in the plaintiff's complaint, it must accept the "uncontroverted allegations" contained therein as true. *Id.* Furthermore, "all conflicts in the facts must be resolved in favor of the plaintiffs for purposes of determining whether a prima facie case for personal jurisdiction has been established." *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985).

A "federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009). In the present case, it is not necessary for the Court to proceed past the first step of the analysis.

Mississippi's long-arm statute provides:

> Any . . . foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in

>Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

MISS. CODE ANN. § 13-3-57 (2010). Plaintiff argues that this Court's jurisdiction over Defendant is appropriate under all three prongs of Mississippi's long-arm statute.

### A.      *Contract Prong*

In order for Defendant to be subject to the jurisdiction of Mississippi courts under the long-arm statute's contract prong, Defendant must have entered a contract with a Mississippi resident to be performed in whole or in part within Mississippi. *Id.* Plaintiff argues that Defendant was a party to its insurance premium financing agreements. Plaintiff alleges that Defendant knew Rocco facilitated the contracts and argues that Rocco was Defendant's agent in that respect. Of course, Defendant contends that it was not a party to the contracts, and that Rocco was not its agent.

In *Stripling v. Guardian Energy Exploration Co.*, 234 F.3d 863, 870 (5th Cir. 2000), the Fifth Circuit addressed a situation similar to this one. Stripling, a Mississippi plaintiff, argued that Guardian, a foreign defendant, was subject to jurisdiction under the contract prong of Mississippi's long-arm statute. *Id.* Stripling argued that Jordan, one of the other defendants, had entered the contract with Stripling on Guardian's behalf. *Id.* Stripling contended that Guardian was a party to the contract under theories of agency, joint venture, and assignment. *Id.* Guardian characterized its role as that of a passive investor. *Id.*

>The Court explained the Mississippi agency rules which governed the dispute:
>
>An agency relationship may be express or de facto. A de facto agency may be proven by the presence of three elements at the time of contracting: (1) "manifestation by the alleged principal, either by words or conduct, that the alleged agent is employed as such by the principal," (2) "the agent's acceptance of the arrangement," and (3) "the parties understood that the principal will control the undertaking."

*Id.* (quoting *Forest Oil Corp. v. Tenneco, Inc.*, 626 F. Supp. 917, 921 (S.D. Miss. 1986)). The Court

5

continued:

> Whether an agency relationship exists is "to be determined by the relations of the parties as they exist under their agreements or acts, with the question being ultimately one of intention . . . . If relations exist which will constitute an agency, it will be an agency whether the parties understood the exact nature of the relation or not. Moreover, the manner in which the parties designate the relationship is not controlling, and if an act done by one person in behalf of another is in its essential nature one of agency, the one is the agent of such other notwithstanding he is not so called.

*Id.* (quoting *Engle Acoustic & Tile, Inc. v. Grenfell*, 223 So. 2d 613, 617-18 (Miss. 1969)).

In *Stripling*, there was evidence that Jordan (the signatory to the contract) agreed to purchase from Stripling (the Mississippi plaintiff and signatory to the contract) a certain amount of the interest in an oil and gas lease for Guardian (the foreign defendant). *Id.* Therefore, the plaintiff had presented prima facie evidence that Jordan was acting on Guardian's behalf. *Id.*

In the present case, the financing agreements themselves provide no evidence that Rocco acted on Defendant's behalf. The only parties other than Plaintiff to sign the financing agreements were Rocco and some of the primary insureds. In some of the contracts, Rocco signed on behalf of the primary insured as an "Authorized Signatory." In others, the primary insured signed the contract. In each of the contracts, Rocco signed as the "AGENT." Each contract lists the insurance company writing the policy and the general agent through whom the policy was to be purchased. Defendant is listed as the "general agent" on each contract. However, there is no indication in the contracts themselves that either the insurance company or the general agent were parties to the negotiation, execution, or performance of the financing agreements.

Plaintiff argues that the Broker's Agreement between Rocco and Defendant establishes that Rocco acted as Defendant's agent in accepting premium payments from Plaintiff. However, the Agreement is clear that Rocco was not authorized to accept premium payments on behalf of

6

Defendant. Rocco was authorized to submit applications for insurance to Defendant, but he was not authorized to bind coverage without receiving Defendant's prior authorization, and he was not authorized to accept payment of premiums or deposit checks made payable directly to Defendant. Rather, Defendant sent Rocco a monthly billing of premiums for policies placed with Defendant by Rocco, and Rocco guaranteed Defendant payment of all premiums for policies placed by Rocco. Therefore, contrary to Plaintiff's argument, the Broker's Agreement does not establish that Rocco accepted premium payments on behalf of Defendant.

Plaintiff also argues that Defendant represented to it that Rocco was acting as its agent with regard to the financing agreements. However, the e-mail communications which Plaintiff argues support this assertion do not provide any evidence that Rocco was Defendant's agent. Defendant periodically communicated with Plaintiff about matters such as cancellation, reinstatement, or whether policies had actually been issued, but the e-mails contain no evidence that Rocco acted as Defendant's agent with regard to the financing agreements. Indeed, in one of the e-mails, Sylvie Benoit, an employee of Defendant, told Jon Kane, an account services manager for Plaintiff, that payment coupons for the policies should be sent to Rocco, rather than Defendant. Benoit told Kane that he should only send her notices of cancellation and requests for reinstatement of policies.

While Plaintiff and Defendant also discussed the payment of premiums, there is no indication within those e-mails that Rocco acted as Defendant's agent. Indeed, the evidence presented by Plaintiff indicates that around March 29, 2010 – after insureds began defaulting on their obligations under the finance agreements – Plaintiff began contacting Defendant to ask about the remittance of unearned premiums. Defendant communicated to Plaintiff that it had never received premium

payments for some of the accounts, despite Rocco's claims that it had paid Defendant.[4] A barrage of e-mails among Plaintiff, Defendant, and Rocco ensued, in which both Plaintiff and Defendant attempted to sort out what had occurred. The communications can be reduced to the following: 1) Plaintiff asked where its unearned premiums were; 2) Defendant represented that it had never been paid premiums on the policies in the first place; and 3) Rocco represented that it had paid premiums to Defendant.[5] Nothing in the e-mails indicates that an agency relationship existed between Rocco and Defendant. To the contrary, the e-mails indicate that neither Plaintiff nor Defendant knew or controlled what Rocco was doing.

Finally, Plaintiff argues that Defendant expressly admitted in writing that it accepted payments from Plaintiff – through Rocco – on some of the policies at issue in this matter. Plaintiff cites a spreadsheet produced to it by Defendant on March 11, 2011 which outlines the various policies placed by Rocco, their effective dates, their costs, premiums paid to Defendant by Rocco, and unearned premiums paid by Defendant to Plaintiff. However, the spreadsheet contains no evidence whatsoever that Defendant controlled or manifested that it controlled Rocco's actions at any point during these events.

Plaintiff essentially argues that Defendant's admission that it received any funds from Rocco

---

[4]Plaintiff asserts in briefing that Carol Roy, an accounting manager with Defendant, "repeatedly contacted" Plaintiff to complain that it had not received premium payments. That is an inaccurate characterization of the evidence. The e-mail from Roy – which can be found in Exhibit H [15-8] to Plaintiff's Response to Defendant's Motion to Dismiss – indicates that she was responding to an e-mail from Jon Kane. Kane then forwarded Roy's e-mail to Roetto (with Rocco) to inquire about the missing premium payments and stated that he asked Roy to verify that Rocco had paid Defendant the premiums on certain policies.

[5]Curiously, Rocco assured Plaintiff that it would provide proof that it had remitted the premium payments to Defendant, yet no such evidence is currently before the Court.

that originated with Plaintiff is an admission of agency, but the pertinent issues in determining agency are 1) whether Defendant manifested, by word or deed at the time the financing agreements were executed, that Rocco was its principal; 2) whether Rocco accepted this arrangement; and 3) whether the parties understood that Defendant was in control of Rocco throughout the undertaking. *Id.*[6] Plaintiff has not presented any evidence to this effect. Indeed, Plaintiff has not presented any evidence that Defendant had a role in the solicitation, negotiation, execution, or performance of the financing agreements. Accordingly, the Court finds that Plaintiff has failed to present prima facie evidence that jurisdiction is proper under the contract prong of Mississippi's long-arm statute.

### B.     *Tort Prong*

For the Court to exercise jurisdiction over Defendant under the tort prong of Mississippi's long-arm statute, Defendant must have "commit[ed] a tort in whole or in part in this state against a resident or nonresident of this state . . . ." MISS. CODE ANN. § 13-3-57 (2010). "If the injury occurs in Mississippi, the tort is committed, at least in part, in the state, and the requirements of the long-arm statute are satisfied. The tortfeasor's presence in Mississippi is not required; causing an injury that occurs in the state is sufficient." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270-71 (5th Cir. 2006) (citations omitted).

Plaintiff alleges that Rocco – and, therefore, Defendant – committed numerous torts against it, a Mississippi resident, causing it to suffer injury in the state of Mississippi. However, as the Court explained above, Plaintiff has not presented any evidence that Rocco was Defendant's agent or that

---

[6]*See also In re Northlake Dev. L.L.C.*, 60 So. 3d 792, 796 (Miss. 2011) (absent some form of legal authority, an agent is powerless to affect the legal relationship between his principal and others); *Mladineo v. Schmidt*, 52 So. 3d 1154, 1167 (Miss. 2010) (to recover under a theory of apparent authority, a party must present evidence of acts or conduct on the part of the principal indicating the agent's authority).

Defendant had any role in the solicitation, negotiation, execution, or performance of the financing agreements. Furthermore, Plaintiff has not presented any evidence that Defendant authorized or controlled Rocco's actions, or that Rocco was otherwise acting on Defendant's behalf. Accordingly, the Court finds that it does not have personal jurisdiction over Defendant under the tort prong of Mississippi's long-arm statute.

### C.     *Doing Business Prong*

The requirements for exercising jurisdiction pursuant to the doing business prong of Mississippi's long-arm statute are: "(1) the nonresident corporation must purposefully do some act or consummate a transaction in Mississippi; (2) the cause of action must either arise from or be connected with the act or transaction; and (3) the assumption of jurisdiction by Mississippi must not offend traditional notions of fair play and substantial justice." *Gross v. Chevrolet Country*, 655 So. 2d 873, 1995 Miss. LEXIS 226, at *9-*10 (Miss. 1995).

Plaintiff argues that Rocco – and, therefore, Defendant – purposefully engaged in business in the state of Mississippi by initiating premium financing agreements with Plaintiff. As already explained, Plaintiff has not presented any evidence that Rocco was Defendant's agent or that Defendant had any role in the solicitation, negotiation, execution, or performance of the financing agreements. Furthermore, Plaintiff has not presented any evidence that Defendant authorized or controlled Rocco's actions, or that Rocco was otherwise acting on Defendant's behalf. Accordingly, the Court finds that it does not have personal jurisdiction over Defendant under the doing business prong of Mississippi's long-arm statute.

As Plaintiff failed to present prima facie evidence to support the exercise of jurisdiction under Mississippi's long-arm statute, it is not necessary for the Court to address the due process

clause of the Fourteenth Amendment.

### III. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has not presented prima facie evidence that the exercise of jurisdiction over Defendant is appropriate under Mississippi's long-arm statute. Accordingly, Defendant's Motion to Dismiss [9] for lack of personal jurisdiction is **granted**.

SO ORDERED AND ADJUDGED this 21st day of September, 2011.

> *s/Keith Starrett*
> UNITED STATES DISTRICT JUDGE